IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 1:18-CR-7 |
| | § | |
| JOEL VARGAS (3) | § | HONORABLE MARCIA CRONE |
| ANGELICA MARIA VARGAS (5) | § | |

**GOVERNMENT'S TRIAL BRIEF**

The United States, before jury selection in this matter, files this Trial Brief summarizing the case to be presented, and alerting the Court to any evidentiary and legal issues.

**1.     Anticipated Trial Evidence**

Since at least 2008, Joel Vargas and other have burglarized tires stores and stolen 18-wheeler tires from various stores throughout Texas and elsewhere. Tire company internal investigators and police agencies throughout Texas began to notice a pattern. The burglaries involved cutting through fences, cutting holes in metal buildings, disabling or destroying surveillance equipment, and using U-Haul trucks to haul away the 18-wheeler tires. Also, the 18-wheeler tires stolen were the most expensive type on the market.

Locally, a Goodyear tire store at 1255 W. Cardinal Drive, Beaumont, Texas, was burglarized on December 17-18, 2017. The pattern was largely the same as the more than 200 other tire store burglaries. They cut into a metal building, attempted to disable surveillance equipment, stole high-end 18-wheeler tires, and used U-Haul trucks. They

did not need to cut through a fence because a neighboring business had an unlocked gate. Once inside the neighboring business, they were able to cut into an office with metal walls, and from there, broke into the area where Goodyear stored the 18-wheeler tires.

Surveillance inside the office captured the face of a burglar who wore a hat and a mask but had visible eyes, cheeks and a forehead. Cooperating defendants and witnesses as well as Beaumont Police Detective Tina Lewallen will identify the person as Joel Vargas.

Michael King, an internal investigator with Goodyear, reached out to Lewallen after she was assigned the case on December 19, 2017. Lewallen assembled a list of similar incidents throughout Texas and began contacting the relevant law enforcement agencies. On January 5, 2018, Texas DPS Special Agent Carrol Frost from San Antonio contacted Lewallen because he believed they both were investigating the same subjects.

Through and undercover officer, DPS bought stolen tires from Joel Vargas' brother, Arthur Vargas. Frost and Lewallen set up a sting operation using the undercover office after consulting the United States Attorney's Office for the Eastern District of Texas. The plan was to have Arthur Vargas transport stolen tires from Louisiana back to Texas. King agreed to provide the tires for the sting.

As the logistics for the sting were being worked out, the San Antonio Police Department arrested Joel Vargas, Alfonso Sosa, and Myra Mineola as they returned to San Antonio from a tire burglary that in Wichita Falls, Texas, on January 15, 2018. A 911 caller, later learned to be testifying co-defendant Danielle Ybarra, called police and said a U-Haul truck was driving erratically on the highway. Ybarra later admitted that

she made the call at the direction of Arthur Vargas, who is Joel's brother.[1] While booking the Joel Vargas, Sosa and Mineola, Frost and Lewallen seized their cell phones and obtained state search warrants to extract data from them.

Meanwhile, Lewallen and Frost completed planning for the sting. The plan was for Vargas to drive to Lake Charles, Louisiana, and pick up stolen tires from the San Antonio undercover officer's "cousin." With assistance from the Calcasieu Parish Sheriff's Office, the Beaumont Police rented a storage facility in Lake Charles. Officers helped Arthur Vargas and testifying co-defendant Barki Holley load tires into a U-Haul. Holley drove the U-Haul back west, while Arthur Vargas and Ybarra drove west in a diesel truck. Once they reached Beaumont, police did traffic stops on both vehicles and arrested Arthur Vargas, Holley and Ybarra. Similar to Wichita Falls, police seized their cell phones as part of the booking process and obtained search warrants to extract data from them. Arthur Vargas and Holley were charged federally by a complaint, and Ybarra was released. Holley gave a post-*Miranda* statement to law enforcement.

After this sting and the arrests after the Wichita Falls burglary, law enforcement had the names of Joel Vargas, Arthur Vargas, Alfonso Sosa, Barki Holley and Daniella Ybarra as suspects and had their cell phones. Lewallen began to seek federal court orders to obtain the historical geolocation data from the seized cell phones. From February through April 2018, Lewallen received call detail records from the phone companies servicing the phones, which told her what cell phone towers the phones contacted to

---

[1] Joel and Arthur Vargas were feuding at the time, and Ybarra was dating Arthur.

while making or receiving phone calls or text messages. Lewallen then uploaded this information into a mapping software called Cell Hawk. The software generates images and animations showing where a phone traveled to and from during a certain period. Using this program, Lewallen was able to learn what suspect's cell phone was in what location during what specific tire store burglary.

From this information, Lewallen and Frost began interviewing people in the San Antonio area. First, they approached Ybarra, who admitted she had driven Arthur Vargas and his associates such as Holley to tire store burglaries and multiple occasions. They then approached buyers such as cooperating co-defendant Carlos Godinez and witness Bill Hall, who told them they buy tires from Joel Vargas. They then interviewed Vivian Brown who rented a property to Joel Vargas. Officers found tires and a safe with paperwork connected to a tire store burglary on the property.

During the post-arrest interview of Holley on January 18, 2018, officers learned of a "Mario" who had a Banditos' connection with Joel Vargas. On April 10, 2018, located Mario Gonzales in San Antonio. They learned that Mario Gonzales was involved with the Banditos, but his son Raymond Gonzales lived with Joel Vargas. When they interviewed Raymond Gonzales, they learned he was actively committing burglaries with Joel Vargas and in fact had one planned that night in Kirby, Texas.

With Raymond Gonzales, agents set a second sting. Joel Vargas, Raymond Gonzales, Aaron Cardenas and John Arranda burglarized a tire store in Kirby, Texas. Raymond Gonzales informed police when they were done, which led to the arrest of the other participants.

Raymond Gonzales also informed police that he worked with Joel Vargas on a series of tire store burglaries throughout Texas. He has since identified himself in news footage in an August 2017 burglary in Edinburg, Texas.

After Joel Vargas posted a bond from this arrest on April 11, 2018, he approached Mario Gonzales the next day about Raymond Gonzales' cooperation with law enforcement. Both Mario Gonzales and Joel Vargas were Banditos' prospects. Joel Vargas told Mario Gonzales that "they" were not happy about Raymond Gonzales' cooperation with authorities. Mario Gonzales understood the "they" to be the Banditos. The Banditos are a so-called "1 percenter" motorcycle club, which is a reference to the fact that the members of the club believe they are in the 1 percent of motorcyclists affiliated with "outlaw" motorcycle clubs. Because of this, Mario Gonzales understood Joel Vargas to be threatening him physically through their association with the Banditos.

Law enforcement then researched past police contacts Joel Vargas had. They discovered a 2013 tire store that led to an indictment of Joel Vargas and a Michael Lopez. Law enforcement interviewed Lopez, who said he and Joel Vargas did tire store burglaries until he went to prison for the 2013 incident. Lopez was upset that Joel Vargas was not as harshly punished as he was. Lopez also said that he was with Joel Vargas as they met a "Carlos" and sold stolen tires to him. This Carlos told them he took the stolen tire to Mexico.

After these interviews, Lewallen used the Cell Hawk software to create mapping images and animations that placed cell phones connected various conspirators in the location of various tire store burglaries at the times they happened. During trial, the

government will cover in depth the following burglaries with corresponding cellphone geolocation data:[2]

| Incident | Dates | Cellphones in the location |
|---|---|---|
| Bryan/College Station | March 8-9, 2017 | Arthur Vargas |
| Edinburg | August 13-14, 2017 | Joel Vargas, Angelica Vargas |
| Beaumont | December 17-18, 2017 | Joel Vargas, Alfonso Sosa |
| Longview | December 22-23, 2017 | Joel Vargas, Alfonso Sosa |
| Wichita Falls | January 14-15, 2018 | Joel Vargas, Alfonso Sosa, Myra Mineola |

The Government will also cover in depth the January 17-18, 2018, sting in Lake Charles and the April 10, 2018, sting in Kirby, Texas, as discussed above.

The government also expects testifying co-defendant Barki Holley to say Angelica Vargas paid him for the burglaries he did using Joel Vargas' stolen tires sales proceeds.

**2.     Elements**

The elements are:

*Counts 1 and 2 — 18 U.S.C. § 2314, Interstate Transportation of Stolen Property*

*First:* That the defendant transported in interstate commerce items of stolen property as described in the indictment;

*Second*: That at the time of such transportation the defendant knew that the property had been stolen; and

*Third*: That the property had a value of $5000 or more.

---

[2] These represent only a sampling of the more than fifty burglaries that cell phone geolocation data places a conspirator in the area of a burglary when the burglary happened.

6

*Count 3 — 18 U.S.C. § 371, Conspiracy*

*First*: That the defendant and at least one other person made an agreement to commit the crime of interstate transportation of stolen property, as charged in the indictment;

*Second*: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third*: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

*Count 4 — 18 U.S.C. § 1512(b)(1), Intimidation to Influence Testimony*

*First*: That the defendant used intimidation or threats against another person, or attempted to intimidate or threaten another person; and

*Second*: That the defendant acted knowingly and with intent to dishonestly influence, delay or prevent the testimony of R.G. with respect to a federal grand jury investigation or trial, an official proceeding.

A prosecution under Title 18, United States Code, Section 1512(b)(1) may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred. 18 U.S.C.A. § 1512(i) (West).

In order to convict the defendant of Count 4, the United States need not prove that an official proceeding was pending or about to be instituted at the time or the alleged offense, or that the Defendant was aware that an official proceeding was pending before a

Federal grand jury.  18 U.S.C.A. § 1512(f)-(g) (West).

**3.      Possible legal issues**

*A.      Prior Consistent Statements*

Cooperating co-defendants Ybarra and Holley have all given statements during 1) post-arrest interviews with law enforcement, 2) proffer sessions with prosecutors, law enforcement and their counsel, and 3) trial testimony preparation with prosecutors, law enforcement and their counsel.  Similarly civilian witnesses Lopez, Mario Gonzales, and Raymond Gonzales all gave statements during 1) post-arrest interviews with law enforcement, and 2) trial testimony preparation with prosecutors, law enforcement and their counsel.

Fed.R.Evid. 801(d)(1)(B)(i) allows the introduction of prior consistent statements when the declarant testifies and is subject to cross-examination about a prior statement, and the statement is consistent with the declarant's testimony and is offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."  The prior consistent statement "must have been made 'before the charged recent fabrication or improper influence or motive." *United States v. Wilson*, 355 F.3d 358, 361 (5th Cir. 2003)(*quoting Tome v. United States*, 513 U.S. 150, 167 (1995)).  A prior consistent statement may be admitted through a third party after the declarant has testified as long as the declarant is available for recall. *See, United States v. Montague*, 958 F.2d 1094, 1098 (D.C. Cir. 1992) (and cases cited therein); *United States v. Zuniga-Lara*, 570 F.2d 1286 (5th Cir. 1978).  Further Rule

8

801(d)(1)(B)(ii) allows the introduction of prior consistent statements when "to rehabilitate the declarant's credibility as a witness when attacked on another ground."

The defendants may attempt to suggest that Government witnesses are lying to receive substantial assistance or some other benefit. *See, e.g., Wilson*, 355 F.3d at 361. Here all declarants will be available for recall if defense counsel desires.

These witnesses are subject to cross-examination about their trial testimony and any pre-trial statement they made, including those made before they signed plea agreements. The implication that they are incredible because of a desire for substantial assistance is a classic allegation of recent fabrication. The statements, except for the trial preparation ones, were made in before a plea agreement was in place. Thus, the impeachment would be on grounds of recent improper influence of motive, and Rule 801(d)(1)(B)(i) and (ii) both allow the prior statements to be introduced. Similar logic applies if defense counsel impeaches the witnesses on other grounds such as fault memory or inability to perceive.

The same is true for civilian witnesses Michael Lopez, Mario Gonzales, and Raymond Gonzales. Because of safety concerns, Texas DPS is transporting these witnesses in a van to make sure they are all present at trial. The government has instructed the transporting officers not to allow them to discuss the case during transport. Should they be impeached examined on grounds of improper influence because of this transport, their prior consistent statements should be admitted because they happened before transport. As with the co-defendant witnesses, if defense counsel impeaches these

9

witnesses on other grounds such as fault memory or inability to perceive, their prior consistent statements should be admitted.

### B. *Sosa being convicted and not testifying*

Defendant Alfonso Sosa has pleaded guilty but refuses to testify in this matter.[3] The government agrees not to use the fact that Sosa has been pleaded guilty as evidence against Joel and Angelica Vargas. *See United States v. Fleetwood*, 528 F.2d 528 (5th Cir. 1976); *United States v. Davis*, 487 F.2d 112 (5th Cir. 1973); *Babb v. United States*, 218 F.2d 538 (5th Cir. 1955); *Leroy v. Government of Canal Zone*, 81 F.2d 914 (5th Cir. 1936). This rule of exclusion is founded upon the notion that a codefendant's guilty plea or conviction with respect to similar or identical charges has only slight probative value on the question of the defendant's guilt, but is extremely prejudicial. *United States v. Corona*, 551 F.2d 1386, 1388 (5th Cir. 1977); *United States v. Hansen*, 544 F.2d 778, 780 (5th Cir. 1977).

But the government does reserve the right to uses Sosa's conviction should either defendant open the door to it. *United States v. Ramos*, 861 F.2d 461, 468-69 (6th Cir.1988) (having opened a up a subject, despite its limited relevance, a party cannot complain on appeal if his opponent pursues the issue). Especially if defense counsel challenges the validity or accuracy of the geolocation mapping showing Joel Vargas' cell phone present at the locations of several burglaries, the fact that Sosa's cell phone was present at many of the same locations and that Sosa has pleaded guilty becomes more

---

[3] Even if he were to receive a 100 percent reduction in his sentence, he still must serve 3.5 years of state imprisonment for the Wichita Falls incident.

relevant. Sosa's admitted guilt based largely on his cell phone location makes the cell phone mapping of Vargas' phone more likely to be true than it was before and makes any prejudice less unfair. *See* Rule 401, 403. Thus, if defense counsel challenges the validity of the cell phone mapping, they are opening the door to the admission of Sosa's conviction.

*C. Excusing multiple case agents from "the Rule"*

Under Rule 615, should a party request it, the Court must exclude witnesses so that they cannot hear other witnesses' testimony. The government respectfully requests that, should the defense invoke this rule, the Court exclude DPS Special Agent Carol Frost and Beaumont Police Detective Tina Lewallen from its provisions. Frost is only expected to testify if a civilian witness testifies differently than a past interview or if he is needed to testify to prior consistent statements. As the Court and parties are aware, this case was investigated jointly by both agencies.

Rule 615 contains exceptions that permit the Court to allow both case agents to remain in Court throughout the duration of the trial. Those exceptions include those individuals who are employees of parties that are not natural persons, after being designated as that party's representative, as well as individuals whose presence a party shows to be essential to presenting the party's claim or defense. See Rule 615(b), (c).

The decision as to how many agents may be excused from sequestration is within the discretion of the Court. *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). The Fifth Circuit has not definitively held whether one or more case agents may be exempted solely because they are designated as representatives of a party, pursuant to Rule

615(b). *See generally United States v. Payan*, 992 F.2d 1387, 1394 (5th Cir. 1997). The government believes that, as they represent two separate and distinct agencies, both agents should be exempted from sequestration pursuant to this exception.

Regardless, the government believes the third exception applies, as both agents are essential to the presentation of the government's case. Rule 615(c). The breadth and scope of the investigation undertaken by these agents and the complexity of the case is significant. Both Lewallen and Frost have interviewed multiple witnesses and reviewed thousands of documents during the last two years, and the moving parts orchestrated jointly by each demonstrates that they will be essential to the government throughout trial. Thus, the government requests that both be excluded from sequestration.

*D. Cell phone geolocation mapping*

Cell phone geolocation mapping has been accepted in federal court for more than twenty years. *See United States v. Weathers*, 169 F.3d 336, 339 (6th Cir.1999) (allowing expert testimony based on cell site analysis); *United States v. Sepulveda*, 115 F.3d 882, 891 (11th Cir.1997) (same). In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the United States Supreme Court set forth a nondispositive, nonexhaustive list of factors that the district court could use to assess the reliability of scientific expert testimony, including (1) whether the expert's theory or technique can be tested or challenged in some objective sense; (2) whether the technique or theory has been subject to peer review or publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific

community. Rule 702 of the Federal Rules of Evidence encompasses the *Daubert* inquiry, and also gives district courts flexibility in determining whether an expert's testimony is reliable. *See Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004); Fed.R.Evid. 702 advisory committee's note (2000 Amendments). The *Daubert* factors are meant to be helpful and not definitive, and the Supreme Court has recognized that all five factors do not "necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999).

Here, Detective Lewallen has used cell phone mapping manually since 2011. She has personally used this technique more than 300 hundred times[4] and the Beaumont Police Department has used it at least 500 times. She can testify that the field is both tested and established. She attended a training that is specific to the Cell Hawk software in 2018 to apply her previous cell phone mapping knowledge to this specific software.

Ultimately, she used her training to compile data from service providers. She requested certain documents with certain location information from the phone service providers. She took what she received from them and mapped it through a program. She manually rechecked at least 20 of the data points to confirm the program was providing accurate data in this case. The mapping does not require expertise. It is just plotting latitude and longitude data of cell phone towers. Any expertise comes from her knowledge of what to ask for from the cell phone companies. Ultimately, she asked for

---

[4] She will testify this is an extremely low estimate.

data that gave her cell phone locations at certain times and used software to map that data. Based on this information, her testimony falls well within the confines of *Daubert* and Rule 702.

Respectfully,

JOSEPH D. BROWN
UNITED STATES ATTORNEY


/s/ Christopher Rapp
CHRISTOPHER RAPP
ASSISTANT U.S. ATTORNEY
350 Magnolia, Ste. 150
Beaumont, TX 77701
Phone: 409-839-2538
Arizona Bar No. 025704

CERTIFICATE OF SERVICE

I hereby certify that a copy of this Government's Trial Brief was delivered to Rey Morin and James Makin, counsel for the Defendants on this 24nd day of March, 2019.

/s/ Christopher Rapp
CHRISTOPHER RAPP
ASSISTANT U.S. ATTORNEY